**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**May 15, 2025**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP673**

**STATE OF WISCONSIN**

Cir. Ct. No. 2023CV2379

**IN COURT OF APPEALS
DISTRICT IV**

SIERRA CLUB,

PETITIONER-APPELLANT,

V.

WISCONSIN DEPARTMENT OF NATURAL RESOURCES,

RESPONDENT-RESPONDENT,

WISCONSIN PUBLIC SERVICE CORPORATION AND
WISCONSIN ELECTRIC POWER COMPANY,

INTERESTED PARTIES-RESPONDENTS.

APPEAL from an order of the circuit court for Dane County: FRANK D. REMINGTON, Judge. *Affirmed in part, reversed in part and cause remanded with directions*.

Before Kloppenburg, P.J., Graham, and Taylor, JJ.

¶1 KLOPPENBURG, P.J. The Department of Natural Resources (Department) issued to Wisconsin Public Service Corporation and Wisconsin Electric Power Company (collectively, Applicants) an air permit allowing Applicants to build and operate a natural gas-fired electric generation plant at the existing Weston Generating Station in Kronenwetter, Marathon County.[1] Sierra Club, which submitted comments on the draft permit during the public comment period, challenged several aspects of the permit in a petition for a contested case hearing, which the Department granted. The parties filed motions for summary judgment, and the Administrative Law Judge (ALJ) issued an order granting Applicants' and the Department's motions in part and denying Sierra Club's motion. The ALJ held a hearing on the remaining issue and subsequently issued an order affirming the permit. The Department adopted the ALJ's decision without change as its own final decision, *see* WIS. ADMIN. CODE § NR 2.155(1) (through Nov. 2024), and Sierra Club petitioned for judicial review.[2] The circuit court affirmed the ALJ's decision.

¶2 On appeal, Sierra Club argues that: (1) the ALJ erred when it concluded that the Department was not required to consider supplemental battery storage as a pollution mitigation measure in step one of the best available control technology (BACT) analysis; and (2) the procedure the Department employed for setting background pollutant concentrations for the permit (the Background

---

[1] The permit authorized Applicants "to construct seven (7) natural-gas fired reciprocating internal combustion engine [RICE] electric generating units, a natural gas-fired emergency generator, natural gas-fired space and water heaters, and natural gas piping." For ease of reading, we will refer to these collectively as "RICE units" or as "the Project."

[2] All references to WIS. ADMIN. CODE § NR are to the November 2024 register unless otherwise noted.

Concentration Protocol) is invalid as an unpromulgated rule. Applicants and the Department argue that Sierra Club's challenges lack merit, and the Department also argues that Sierra Club lacks standing to bring its challenges.

¶3 We first conclude that Sierra Club has standing to bring these challenges, as it sufficiently alleged injuries to its members caused by the Department's action in granting the permit. Second, we conclude that the ALJ's decision that the Department appropriately excluded supplemental battery storage from step one of the BACT analysis is supported by substantial evidence and consistent with applicable law. Third, we conclude that the Background Concentration Protocol is invalid because it meets the statutory definition of a rule and, therefore, should have been but was not promulgated in compliance with the statutory rulemaking procedures set forth in WIS. STAT. ch. 227 (2023-24).[3]

¶4 Accordingly, we affirm in part and reverse in part the circuit court's order affirming the ALJ's decision. We remand to the circuit court to remand to the Department to reopen the permit and to proceed consistent with this opinion, and to keep the permit in place during remand proceedings.

## BACKGROUND

¶5 We present a brief overview of the background here and provide detailed facts pertinent to each issue in the discussion that follows.

¶6 In April 2021, Applicants applied to the Department for an air pollution control permit, *see* WIS. STAT. §§ 285.60-.61, to construct and operate

---

[3] All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

the Project.  In December 2021, the Department deemed the application complete and, consistent with statutory procedures, prepared an "analysis and preliminary determination" document along with a draft permit and noticed both for public comment.  *See* § 285.61(3)(a), (4).

¶7      During the public comment period, in January 2022, Sierra Club submitted comments on the draft permit.[4]  Pertinent here, Sierra Club argued that: (1) the Department was required to consider incorporating battery storage into the Project as an identified pollution mitigation measure in step one of the BACT analysis; and (2) the Background Concentration Protocol is "a 'statement of general policy' that must be promulgated by rule, and also meet[s] the definition of a rule."  At Sierra Club's request, the Department held a public hearing on February 2, 2022.

¶8      The Department considered the comments by Sierra Club and others and responded in a detailed memorandum.  Pertinent to the two arguments identified above, the Department explained that it "determined that … adding energy storage [including batteries] to the RICE [u]nits would constitute a redefinition of the source and that therefore it was appropriate that such options were not included in [s]tep [one] of its … BACT review for the RICE [u]nits." The Department also rejected Sierra Club's argument that the Background Concentration Protocol constitutes a rule required to be promulgated following rulemaking procedures.

---

[4] The comments were submitted on behalf of Sierra Club and Clean Wisconsin.  For ease of reading, and because only Sierra Club appeals, we refer only to Sierra Club.

¶9    In March 2022, the Department issued final permit number 21-RAB-082, authorizing Applicants to construct the Project.

¶10    In April 2022, Sierra Club petitioned for a contested case hearing on the issuance of the permit, pursuant to WIS. STAT. §§ 227.42-.50 and 285.81. The Department granted a contested case hearing with respect to three issues, including the two issues raised in this appeal. Pertinent here, the ALJ determined on the parties' motions for summary judgment that there were disputes of fact as to whether the Department was required to consider adding battery storage to the RICE units as part of the BACT analysis, specifically as to whether adding battery storage would "redefine the source."[5] The ALJ also determined that, based on the undisputed facts, the Background Concentration Protocol is not a rule.

¶11    The ALJ held a contested case hearing on the BACT issue in May 2023. Following the hearing, the ALJ issued an order concluding that Sierra Club had failed to establish that the Department erred by excluding the addition of battery storage to the RICE units in the BACT analysis, and affirming the issuance of the permit.

¶12    Sierra Club petitioned for judicial review in the circuit court, challenging the ALJ's decision upholding the permit and seeking a declaratory judgment that the Background Concentration Protocol is an unpromulgated rule. In a comprehensive written decision, the court rejected Sierra Club's arguments,

---

[5] In air pollution permitting statutes and rules, plants or facilities that emit air pollution are referred as "sources." *See, e.g.*, WIS. STAT. § 285.01(24)-(25), (27), (41); WIS. ADMIN. CODE § NR 405.02(22)(a), (27m)-(28). Here, consistent with this usage, the word "source" in the phrase "redefining the source" means the Project.

concluded that the Department properly approved the permit, and affirmed the Department's decision.[6]

¶13    Sierra Club appeals.

## DISCUSSION

¶14    As an initial matter, we clarify that, contrary to the Department's assertions, the agency action that Sierra Club challenged in its petition, and continues to challenge on appeal, is the Department's decision to issue the permit, not the specific steps the Department took to get there, such as excluding battery storage from its BACT analysis and creating the Background Concentration Protocol.  While Sierra Club argues that the Department took those steps in error, Sierra Club's challenge is to the agency action that resulted—the issuance of the permit.

### I.  Standing

¶15    The Department argues that Sierra Club lacks standing to challenge the issuance of the permit.  Specifically, the Department argues that Sierra Club has "failed to establish injury, causation, and that any alleged injury was to a legally protected interest."  We reject this argument as unsupported by the law and the record.

---

[6] In its appellate briefing, the Department cites to the administrative record submitted to the circuit court without including parallel cites to the appellate record that was compiled by the clerk of the circuit court.  We remind counsel that the rules of appellate procedure require parties to include appropriate citations to the record that was compiled by the circuit court clerk.  *See* WIS. STAT. RULE 809.19(1)(d)-(e).

¶16 Whether a party has standing is a question of law that we review de novo. *Friends of the Black River Forest v. Kohler Co.*, 2022 WI 52, ¶10, 402 Wis. 2d 587, 977 N.W.2d 342. "Because our state constitution lacks the jurisdiction-limiting language of its federal counterpart, 'standing in Wisconsin is not a matter of jurisdiction, but of sound judicial policy.'" *Id.*, ¶17 (quoting *McConkey v. Van Hollen*, 2010 WI 57, ¶15, 326 Wis. 2d 1, 783 N.W.2d 855). Accordingly, while federal law may be persuasive, Wisconsin courts need not follow federal law on standing. *See Teigen v. WEC*, 2022 WI 64, ¶¶15-16, 403 Wis. 2d 607, 976 N.W.2d 519 (lead op.) (referring to "the inaccurate assumption that Wisconsin courts follow federal law on standing"), *overruled on other grounds by Priorities USA v. WEC*, 2024 WI 32, 412 Wis. 2d 594, 8 N.W.3d 429.

¶17 In Wisconsin, standing "should not be construed narrowly or restrictively." *Wisconsin's Env't Decade, Inc. v. PSC (WED I)*, 69 Wis. 2d 1, 13, 230 N.W.2d 243 (1975). "Standing requirements in Wisconsin are aimed at ensuring that the issues and arguments presented will be carefully developed and zealously argued, as well as informing the court of the consequences of its decision." *McConkey*, 326 Wis. 2d 1, ¶16. "One has standing to seek judicial review when one has a stake in the outcome of the controversy and is affected by the issues in controversy." *Wisconsin Legislature v. Palm*, 2020 WI 42, ¶12, 391 Wis. 2d 497, 942 N.W.2d 900.

¶18 "In the context of judicial review of an administrative decision, standing is governed by WIS. STAT. §§ 227.52 and 227.53." *Friends of the Black River Forest*, 402 Wis. 2d 587, ¶20. Section 227.52 provides that "[a]dministrative decisions which adversely affect the substantial interests of any person … are subject to review as provided in this chapter." Section 227.53(1) provides that "any person aggrieved by a decision specified in [§] 227.52 shall be

entitled to judicial review of the decision as provided in this chapter," with certain exceptions not relevant here. "A 'person aggrieved' is defined as 'a person or agency whose substantial interests are adversely affected by a determination of an agency.'" *Friends of the Black River Forest*, 402 Wis. 2d 587, ¶25 (quoting WIS. STAT. § 227.01(9)). An organization such as Sierra Club has standing "if it alleges facts sufficient to show that a member of the organization would have had standing to bring the action in [the member's] own name." *WED I*, 69 Wis. 2d at 20.

¶19   "Wisconsin uses a two-step test to determine whether a particular petitioner has standing under [WIS. STAT. §§ 227.52 and 227.53(1)]." *Friends of Blue Mound State Park v. DNR*, 2023 WI App 38, ¶25, 408 Wis. 2d 763, 993 N.W.2d 788. First, courts ask "'whether the decision of the agency directly causes injury to the interest of the petitioner.'" *Friends of the Black River Forest*, 402 Wis. 2d 587, ¶18 (quoted source omitted). Second, courts ask "'whether the interest asserted is recognized by law.'" *Id.* (quoted source omitted). While courts construe standing liberally, "'the claim asserted must be legally recognizable in Wisconsin jurisprudence.'" *Id.*, ¶19 (quoted source omitted).

¶20   To satisfy the first prong of Wisconsin's standing test—referred to as "injury in fact," *id.*, ¶21—the petitioner must "allege[] injuries that are a direct result of the agency action." *WED I*, 69 Wis. 2d at 13. "An alleged injury may be sufficiently direct … even when it is 'remote in time or … will [occur only] as an end result of a sequence of events set in motion by the agency action challenged.'" *Applegate-Bader Farm, LLC v. DOR*, 2021 WI 26, ¶17 n.7, 396 Wis. 2d 69, 955 N.W.2d 793 (quoted source omitted). "'[A]llegations of injury to aesthetic, conservational, recreational, health and safety interests will confer standing so long as the injury is caused by a change in the physical environment.'" *Friends of*

*Blue Mound State Park*, 408 Wis. 2d 763, ¶26 (quoting *Milwaukee Brewers Baseball Club v. DHSS*, 130 Wis. 2d 56, 65, 387 N.W.2d 245 (1986)).

¶21 To satisfy the second prong of Wisconsin's standing test—referred to as "legally protectable interest," *Friends of Blue Mound State Park*, 408 Wis. 2d 763, ¶36—the petitioner must show that the alleged injury was "'to an interest which the law recognizes or seeks to regulate or protect.'" *Friends of the Black River Forest*, 402 Wis. 2d 587, ¶30 (quoting *Waste Mgmt. of Wis., Inc. v. DNR*, 144 Wis. 2d 499, 505, 424 N.W.2d 685 (1988)). Our analysis on this prong "centers on a textually-driven analysis of the language of the specific statute cited by the petitioner as the source of its claim to determine whether that statute 'recognizes or seeks to regulate or protect' the interest advanced by the petitioner." *Friends of the Black River Forest*, 402 Wis. 2d 587, ¶28 (quoting *Waste Mgmt.*, 144 Wis. 2d at 505).

¶22 In its petition for judicial review, Sierra Club alleged that its members "live, work, and recreate in Marathon County, downwind from the permitted power plant, and will be affected by the environmental impacts of the [Department]'s decision to permit the plant to construct and operate, including but not limited to impacts on air quality." The parties do not dispute that the Department's action of issuing the permit set in motion the construction of the RICE units, and that the operation of those RICE units results in the emission of "pollutants such as carbon monoxide, nitrogen oxides, and particulate matter." The alleged injuries to Sierra Club members living downwind from the plant, namely, their exposure to increased air pollution from the RICE units, are therefore "sufficiently direct[ly]" caused by the Department's action of issuing the permit. *See Applegate-Bader Farm, LLC*, 396 Wis. 2d 69, ¶17 n.7 (As to the injury-in-fact prong of standing, "[a] party has standing to challenge an

administrative decision when 'the decision of an agency directly causes injury to the interest of the petitioner.'" (quoted source omitted)). Accordingly, Sierra Club satisfies the first prong of standing. *See Sierra Club v. Franklin Cnty. Power of Ill., LLC*, 546 F.3d 918, 925 (7th Cir. 2008) ("'likely exposure' to pollutants" satisfies the injury-in-fact prong of standing, "'even if the ambient level of air quality does not exceed [certain national limits]'" (quoted source omitted)); *see also WED I*, 69 Wis. 2d at 10 (allegations of injury to "conservational and recreational interests ha[ve] been readily accepted as sufficient to confer standing").

¶23 With respect to the second prong, Sierra Club argues that its members' interest in breathing clean air is legally protected by WIS. STAT. ch. 285 and the Department's implementing regulations at WIS. ADMIN. CODE chs. NR 400-499. We agree.

¶24 WISCONSIN STAT. ch. 285 and the implementing regulations govern air pollution in Wisconsin. WISCONSIN STAT. § 285.60 requires persons seeking to construct or modify stationary sources to obtain permits that comply with promulgated rules and the federal clean air act, and to comply with the terms of those permits. Sec. 285.60(1)(a), (7), (8). WISCONSIN STAT. § 285.63 creates substantive criteria for permit approval, which include the requirement to meet applicable emissions limitations and the requirement to use the best available control technology. *See, e.g.*, § 285.63(1)(a), (3)(a).

¶25 WISCONSIN STAT. § 285.60 also directs the Department to promulgate rules for issuing such permits. Sec. 285.60(3)(a). The Department has promulgated regulations, which include substantive requirements necessary for obtaining a permit, in WIS. ADMIN. CODE ch. NR 406. Further, WIS. ADMIN.

10

CODE ch. NR 404 contains substantive standards for ambient air quality in Wisconsin, and WIS. ADMIN. CODE ch. NR 405 contains substantive standards for measuring pollution emissions. *See also* Note, Nov. 2024, WIS. ADMIN. CODE ch. NR 400 ("The objectives of these rules are to maintain standards of air quality at a level which will provide adequate protection to public health and welfare, and prevent detrimental effects on property and our environment.").

¶26    Wisconsin law also recognizes citizens' interests in ensuring that the rules that the Department applies to air emissions permits are valid. Specifically, WIS. STAT. § 227.40(2)(e) expressly provides that a party may challenge the validity of a rule or guidance document in judicial proceedings under WIS. STAT. §§ 227.52 and 227.53 "if the validity of the rule or guidance document involved was duly challenged in the proceeding before the agency in which the order or decision sought to be reviewed was made or entered."

¶27    Together, the provisions in WIS. STAT. ch 285 and WIS. ADMIN. CODE chs. NR 404-406 protect Wisconsinites' interests in breathing clean air by setting out the requirements that proposed sources that affect air quality must meet and by creating substantive standards for preserving ambient air quality. These statutes and regulations protect the interest in clean air asserted by Sierra Club and, therefore, suffice to give Sierra Club standing to challenge the permit that affects that interest. *See **Friends of Blue Mound State Park***, 408 Wis. 2d 763, ¶¶37-38 (statute "which is intended to establish procedures to protect persons or entities asserting environmental interests" sufficed to grant standing); ***Friends of the Black River Forest***, 402 Wis. 2d 587, ¶30 (injury must be "'to an interest which the law recognizes'" (quoted source omitted)).

11

¶28     The Department makes several unavailing arguments to the contrary. First, the Department argues that Sierra Club failed to identify "some direct, real, and immediate injury it had suffered or was imminently facing" and instead "stated nothing more than a vague and generalized interest in less air pollution." As stated, Sierra Club alleged that its members "live, work, and recreate in Marathon County, downwind from the permitted power plant, and will be affected by the environmental impacts of the [Department]'s decision to permit the plant to construct and operate, including but not limited to impacts on air quality." This allegation that members living immediately downwind from the permitted plant would have their conservational and recreational interests injured by the increased air pollution caused by the construction of the RICE units, a direct result of the Department's issuance of the permit, provides adequate grounds for standing. *See WED I*, 69 Wis. 2d at 10 (allegations of injury to conservational and recreational interests sufficient for standing).

¶29     The Department next argues that Sierra Club "was required to do more than simply *allege* any injuries and was instead required to submit *evidence* to support those injuries." *See Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (explaining that, in federal court, the plaintiff "must support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation'" (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992))). The Department does not cite, and our research has not disclosed, a published Wisconsin case that requires a plaintiff to present evidence to support its standing beyond what the plaintiff alleged at the pleading stage. Because our standing analysis differs from that of the federal courts, and because Sierra Club sufficiently alleged in its petition for judicial review that it "has a stake in the outcome of the controversy and is affected by the issues in controversy,"

*Wisconsin Legislature*, 391 Wis. 2d 497, ¶12, we decline to apply this requirement here.

¶30    However, even if we required Sierra Club to submit evidence to support its members' injuries, we would find that requirement satisfied here, where the Department's own analysis concluded that the project would result in significant emissions of, among other things, carbon monoxide and particulate matter.  The Department's conclusion also disposes of its arguments regarding causation and redressability: that Sierra Club did not show how the agency action caused its alleged injury, and that it did not explain how a favorable court decision would redress its alleged air quality injuries.  Specifically, the Department's issuance of the permit led directly to the construction of the RICE units, and the Department's analysis showed that this would lead directly to increased air pollution from the Weston plant.  If the permit were to be vacated in this proceeding, the result would be a cessation or mitigation of that pollution.

¶31    The Department also argues that Sierra Club alleged only procedural errors and that, therefore, Sierra Club must show that the procedural lapses were personal to the organization, citing a federal case in support.  Again, the Department does not cite, and our research has not disclosed, a published Wisconsin case setting forth this requirement, and we decline to create a new barrier to standing in Wisconsin, given that our supreme court has clarified that standing "should not be construed narrowly or restrictively."  *See WED I*, 69 Wis. 2d at 13.

¶32    Finally, the Department cites *Friends of the Black River Forest* in support of its argument that Sierra Club "cannot establish that it has suffered an injury to a legally protected interest."  But that case is patently distinguishable.

The statutes and regulations cited by the petitioners in ***Friends of the Black River Forest*** did not protect the interests that they alleged were harmed by the Department's land exchange with the Kohler Company. *See **Friends of the Black River Forest***, 402 Wis. 2d 587, ¶¶1-3. Specifically, those statutes and regulations did not establish "substantive criteria" by which a person could challenge a decision about park boundaries. *Id.*, ¶¶33-34, 36, 42-43. In contrast, numerous statutes and regulations protect Wisconsinites' interest in breathing clean air and in the promulgation of valid rules, which are the interests that Sierra Club alleged were harmed by the Department's issuance of the air permit here. *See* WIS. STAT. §§ 227.40(2)(e), 285.60, 285.63; WIS. ADMIN. CODE chs. 404-406.

¶33 Provisions such as WIS. STAT. § 285.63(3) set forth the "'substantive criteria' by which [Sierra Club] could challenge" the Department's issuance of the permit, which were missing in the statutes cited in ***Friends of the Black River Forest***. *See **Friends of the Black River Forest***, 402 Wis. 2d 587, ¶¶33, 42-43. These criteria include whether "[t]he source will be subject to the best available control technology," § 285.63(3)(a), and whether "[t]he source will not adversely affect the air quality related values of any federal mandatory class I prevention of significant deterioration area," § 285.63(3)(c). In addition, as stated, WIS. STAT. § 227.40(2)(e) provides that a person may challenge the validity of a rule or guidance document in judicial review proceedings if that person "duly challenged" the validity in the proceeding before the agency. This statute signifies the legislature's recognition of Sierra Club's interest in having rules validly promulgated, when those rules underlie an agency decision that Sierra Club is challenging. *See **Friends of the Black River Forest***, 402 Wis. 2d 587, ¶18 (second prong is whether the interest is "recognized by law").

¶34   In sum on this issue, Sierra Club has sufficiently alleged both that it suffered an injury to its members' interest in breathing clean air, caused by the Department's issuance of the permit, and that the injury was to interests that Wisconsin law "'recognizes or seeks to regulate or protect.'"  *See id.*, ¶30 (quoting ***Waste Mgmt.***, 144 Wis. 2d at 505).  Accordingly, Sierra Club has standing to challenge the permit.

## II.  Whether the Department Erred by Excluding Supplemental Battery Storage in the BACT Analysis

¶35   Sierra Club argues that the Department erred by excluding supplemental battery storage as a pollution mitigation measure in step one of the BACT analysis.

*Standard of Review*

¶36   "The burden in a [WIS. STAT.] ch. 227 review proceeding is on the party seeking to overturn the agency action, not on the agency to justify its action."  ***City of La Crosse v. DNR***, 120 Wis. 2d 168, 178, 353 N.W.2d 68 (Ct. App. 1984).  This court reviews the decision of the agency, not the decision of the circuit court.  ***Cholvin v. DHFS***, 2008 WI App 127, ¶11, 313 Wis. 2d 749, 758 N.W.2d 118.  In this case, pursuant to WIS. STAT. § 227.46(3)(a) and WIS. ADMIN. CODE § NR 2.155(1), we review the ALJ's decision as the Department's decision "because the [Department] adopted the ALJ's decision as its own and did not seek judicial review of the ALJ's decision.  Consequently, the ALJ's decision becomes the [Department]'s decision and will be accorded the same level of deference given to the agency."  ***Sierra Club v. DNR***, 2010 WI App 89, ¶20, 327 Wis. 2d 706, 787 N.W.2d 855 (citation omitted); ***Kohler Co. v. DNR***, 2024 WI App 2, ¶14, 410 Wis. 2d 433, 3 N.W.3d 172 (2023).

¶37     We will uphold the ALJ's findings of fact "as long as they are supported by substantial evidence in the record." *Kitten v. DWD*, 2002 WI 54, ¶5, 252 Wis. 2d 561, 644 N.W.2d 649.  "The test is whether, taking into account all of the evidence in the record, 'reasonable minds could arrive at the same conclusion as the agency.'" *Id.* (quoted sources omitted).  "'Substantial evidence is less of a burden than preponderance of the evidence in that any reasonable view of the evidence is sufficient.'" *Robles v. Thomas Hribar Truck & Equip., Inc.*, 2020 WI App 74, ¶8, 394 Wis. 2d 761, 951 N.W.2d 853 (quoted source omitted). Accordingly, the question here is not whether Sierra Club proffered substantial evidence, but whether the ALJ's findings are supported by substantial evidence. *See Kohler Co.*, 410 Wis. 2d 433, ¶63 (not considering whether challenger presented substantial evidence, but whether ALJ's finding is supported by substantial evidence).  In other words, "'when the issues basically involve a dispute over conflicting testimony and a reasonable [person] could be convinced by either side, it is within the administrative agency's province to weigh it and accept that which it finds more credible.'" *Wisconsin Ass'n of Mfrs. & Com., Inc. v. PSC (WMC)*, 94 Wis. 2d 314, 322, 287 N.W.2d 844 (Ct. App. 1979) (quoted source omitted).

¶38     On the other hand, the Department's interpretation and application of a statute are questions of law subject to de novo review, and this court "shall accord no deference to the agency's interpretation of law." WIS. STAT. § 227.57(11); *see Sierra Club*, 327 Wis. 2d 706, ¶21.  However, in considering the agency's arguments, "'due weight shall be accorded [to] the experience, technical competence, and specialized knowledge of the agency involved.'" *Kohler Co.*, 410 Wis. 2d 433, ¶17 (quoting § 227.57(10)).

*Legal Principles*

¶39    Pertinent here, before the Department may issue an air pollution control permit, it must determine that "[t]he source will be subject to the best available control technology [BACT] for each applicable air contaminant." WIS. STAT. § 285.63(3)(a). Simply stated, BACT means pollution mitigation measures that have been determined, after a source-specific analysis, to achieve the maximum degree of reduction of air pollutants regulated by the federal Clean Air Act. WIS. ADMIN. CODE § NR 405.02(7). The Department "evaluates a permit applicant's BACT determinations under the so-called 'top down' approach utilized by EPA." *Sierra Club*, 327 Wis. 2d 706, ¶12. There are five steps in the top-down BACT analysis, but only the first two are pertinent to our analysis: step one, "identifying all available control technologies for the proposed process or source"; and step two, "evaluating the technical options for feasibility[,] taking into consideration source specific factors." *See id.*

¶40    In step one of the BACT analysis, the Department "consider[s] the capabilities of add-on air pollution control technologies, inherently lower-emitting processes/practices/designs, and combinations of the two that are potentially available and applicable for use at the proposed facility." *In re Arizona Pub. Serv. Co. Ocotillo Power Plant*, 17 E.A.D. 323, 327, 2016 WL 4595563 (EAB 2016).[7] This broad approach has limits: "[c]onsideration of fundamentally

---

[7] "Although we are not bound by the Environmental Appeals Board's (EAB) decisions, its conclusions regarding the factors a permitting agency can consider when determining BACT are instructive and provide guidance. The EAB is the final decision-maker on administrative appeals under all major environmental statutes that the U.S. Environmental Protection Agency administers, including the Clean Air Act." *Sierra Club v. DNR*, 2010 WI App 89, ¶13 n.6, 327 Wis. 2d 706, 787 N.W.2d 855.

different facility types than those proposed by permit applicants generally is not required." *Id.* at 328. Said differently, the Department may exclude from consideration control technologies that would "'redefine the design of the source.'" *Id.* (quoting Office of Air Quality Planning and Standards, U.S. EPA, *New Source Review Workshop Manual* (draft Oct. 1990)). "If a permitting authority decides that a proposed alternative would constitute a redefinition of the source, it will not list the alternative as a potential control option in [s]tep [one] of its BACT analysis, and it will not consider that option further."[8] *Id.* at 335.

¶41 To determine whether a proposed control technology would redefine the source, the Department "should begin by examining how the permit applicant defines the proposed facility's 'end, object, aim, or purpose,' i.e., its 'basic design.'" *Id.* at 336 (citations omitted). That information is typically set forth in the permit application and administrative record. *Id.* The Department "should then take a 'hard look' at the applicant's 'basic design,' identifying design elements that are 'inherent' to the applicant's purpose and design elements that possibly could be altered to achieve pollutant emissions reductions without disrupting that purpose." *Id.* Proposed mitigation measures that interfere with a project's basic purpose and design may be excluded as redefining the source. *See, e.g.*, *In re Sierra Pac. Indus.*, 16 E.A.D. 1, 48-50, 2013 WL 3791510 (EAB 2013) (excluding proposal from BACT analysis as "redefining the source" because it

---

[8] Environmental Appeals Board decisions evaluating challenges to BACT analyses use the phrases "redefine the source" and "redefine the design of the source" interchangeably. When we are not quoting from those decisions, we use "redefine the source."

For ease of reading, and following Sierra Club's lead, we sometimes refer to the "available control technology" or "potential control option" to be identified in step one of the BACT analysis as a "mitigation measure."

would disrupt one of the applicant's primary purposes for the facility). This requires a highly fact-specific analysis, and, "[a]ccordingly, previous permitting decisions for similar sources are instructive but not controlling, and prior determinations that particular emissions control options redefine proposed sources are not necessarily relevant in subsequent analyses of unrelated projects." *In re Arizona Pub. Serv. Co.*, 17 E.A.D. at 337.

¶42     In step two of the BACT analysis, the Department "eliminate[s] 'technically infeasible' options from the potentially available options identified at step [one]." *In re Prairie State Generating Co.*, 13 E.A.D. 1, 13, 2006 WL 2847225 (EAB 2006). One aspect that is generally considered in step two, space constraints, may also be relevant to determining whether the proposed addition of a control technology "would require redesign of the source"; accordingly, the Department may appropriately consider the space needed as a result of the control technology in the "redefining the source" analysis. *See In re La Paloma Energy Ctr., LLC*, 16 E.A.D. 267, 288, 2014 WL 1066556 (EAB 2014) ("Technical factors such as the availability of space and the physical location of the facility … may also inform a permitting authority's decision whether a proposed use of a different [energy source] would require redesign of the source.").

## *Additional Background*

¶43     In their application, Applicants described the Project's "purpose and need" as follows: "This Project provides the capacity, base load, and peaking generation [that Applicants] will need at the lowest cost, and provides additional benefits such as ramping, dynamic voltage control, … inertia, and frequency

response necessary for electric system stability."[9] The application noted that the Project's purpose and need stem in significant part from the retirement of "older, less efficient fossil-fuel generation" throughout Applicants' portfolio and the "substantial shift to renewable generation" that, Applicants asserted, "makes it more difficult to provide continuous energy production and the reliability customers require." Applicants performed their own BACT analyses and proposed BACT mitigation measures that did not include battery storage. As part of its preliminary determination and draft permit, the Department reviewed Applicants' BACT analyses, performed its own BACT analyses, and similarly selected BACT mitigation measures that did not include battery storage.

¶44 In its public comments on the draft permit, Sierra Club argued that "[t]he Department must consider in [s]tep [one] of the BACT analysis whether alternatives that incorporate energy storage could provide functionally equivalent operation at a lower emission rate," and "recommend[ed] that the Department consider three additional alternatives" as BACT mitigation measures: (1) replacing all of the RICE units with battery storage, (2) replacing some of the RICE units with battery storage, and (3) adding battery storage to the RICE units "and altering dispatch to minimize the number of startups and periods of partial load operation." Sierra Club noted that the application itself stated that the RICE units would produce higher emissions during startup events, and Sierra Club asserted that using battery storage instead of the RICE units "for some or all startup events" could avoid those higher emissions.

---

[9] Applicants also submitted a revised application, but the project purpose remained unchanged.

¶45    In its "Summary of Changes and Comments" on the draft permit, the Department responded to Sierra Club's comment regarding considering battery storage as a mitigation measure in step one of the BACT analysis as follows:

> The [D]epartment has determined that replacing some or all of the proposed RICE [u]nits with an energy storage unit or units or adding energy storage to the RICE [u]nits would constitute a redefinition of the source and that therefore it was appropriate that such options were not included in [s]tep [one] of its top-down [greenhouse gas] BACT review for the RICE [u]nits.

The Department further explained that adding energy storage

> constitutes a redefinition of the source because it alters the facility's basic design.  The [D]epartment does not agree with [Sierra Club's] claim that the cleaner production processes aspect of BACT can be read so broadly as to include consideration of an energy storage unit … to supplement energy generation units.  Such changes as part of BACT would go beyond what [the Department] or EPA has previously determined to be a cleaner process and certainly represent a far more substantial change "than would be necessary whenever a plant switched from a dirtier to a cleaner fuel." [(quoting *Sierra Club v. EPA*, 499 F.3d 653, 656 (7th Cir. 2007)).]

In addition, the Department stated that replacing RICE units with battery storage "would result in a project that would not meet the [A]pplicants' stated business needs," namely, providing "continuous dispatchable energy."

¶46    Consistent with the Department's responses to comments, the final permit did not include the addition of battery storage as a mitigation measure in step one of the BACT analysis.  After the Department granted Sierra Club's request for a contested case hearing, the ALJ ordered that "[t]he issues for hearing" included "[w]hether the Department erroneously excluded the addition of battery storage to the [RICE] units in the [BACT] analysis as 'redefining the source.'"

¶47 Sierra Club, the Department, and Applicants filed written direct and rebuttal testimony of their witnesses before the hearing, and those same witnesses testified at the hearing. In his pre-hearing testimony, Sierra Club's witness, Michael Goggin, a consultant on energy issues, opined that adding battery storage to the proposed RICE units "would not disrupt the purpose of the [Project] defined in the permit application," and would in fact enhance the RICE units' ability to achieve Applicants' stated purposes. In their pre-hearing testimony, the Department's witness and all of Applicants' witnesses opined that adding battery storage to the RICE units would redefine the source.

¶48 More specifically, in his pre-hearing testimony, the Department's witness, Ronald Binzley, an Advanced Air Management Engineer at the Department, testified to the following. The Department, after reviewing Sierra Club's comments, "made its evaluation by taking a 'hard look' at the Project to discern which design elements were inherent to the Project, by reviewing BACT analyses conducted in other states for similar projects, and by evaluating the merits of the paired storage options proposed by Sierra Club." The Department "attempted to assess the battery pairing proposals made by Sierra Club as emissions control strategies but was frustrated by the vagueness of the proposals." The Department concluded that adding battery storage to the RICE units would redefine the source because this option would "fundamentally change the Project's design and purpose by adding a new basic design element … that in no way serves the business purposes of the applicants and has no demonstrable potential to reduce emissions."

¶49 In their pre-hearing testimony, Applicants' witnesses focused on Applicants' position that adding battery storage would interfere with the Project's

stated "additional benefit" of providing inertia, which they contended is a "critical element," or purpose, of the Project.

¶50    For clarity, we now provide a brief overview of the concepts of inertia and frequency stabilization as they relate to electrical grids, based on the testimony of the witnesses. An electrical grid consists of, in part, synchronous generators that consist of spinning metal. The generators, of which RICE units are one example, are synched to the grid and to each other, so when "the grid is running at 60 hertz, all the generators are running roughly at 60 hertz and they're all spinning at that frequency." The spinning of the generators creates inertia, an inherent property that makes a moving object "oppose any force that would cause a change in its motion." *See Inertia*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/inertia (last visited May 12, 2025). In the context of the electrical grid, inertia is "already existing spinning kinetic energy," which helps stabilize frequency on the grid during significant grid disturbances.

¶51    A grid disturbance, typically caused by "the loss of a large transmission line or the loss of a large generator," results in the rapid decline of frequency on the electrical grid from the 60 hertz at which it was set. If the frequency declines too much, it can result in major damage to equipment and components on the grid, and, as a result, the equipment will begin to "trip offline," which can result in major blackouts. Accordingly, when a grid disturbance occurs, "frequency stabilization" is required to prevent these negative outcomes. Inertia is one method of frequency stabilization, and fast frequency response is another. The grid "needs inertia to slow the rate of frequency decline in the seconds following a grid disturbance…, because inertia provides time for synchronous generators to begin increasing their output to return frequency to its normal level." Inertia is provided instantaneously because it comes from the existing spinning

kinetic energy on the grid. Fast frequency response, which can be provided by battery storage, "provides a similar service by rapidly injecting power to slow the rate of frequency decline in the seconds following a [grid] disturbance." However, the difference between the instantaneous frequency stabilization provided by inertia and the "fast" frequency response provided by battery storage, although only seconds, can be significant in terms of providing energy stability.

¶52 At the hearing, Sierra Club's witness, Goggin, testified to the following. Applicants do not need inertia for the grid and should not have listed it as a project purpose; what Applicants actually need is frequency stabilization, and inertia is only one of several ways to provide that. While battery storage cannot provide inertia, it can provide "fast frequency response," which is another method of frequency stabilization and can be used "to stabilize frequency in better ways than conventional generators." Adding 26 megawatts (MW) of battery storage, the typical amount for a project this size, would require some redesign of the Project due to the additional space needed.

¶53 Applicants' witnesses testified at the hearing that inertia is necessary to the grid and to the Project. Jody Arendt, the director of planning for the holding company that owns Applicants, testified as follows. Compared to fast frequency response, which can be provided by battery storage and implemented "fast," inertia is instantaneous. Accordingly, fast frequency response does not provide the same reliability benefit to the grid as inertia, and inertia, which is stated as a project purpose in the application, is an essential aspect of the Project. As Applicants and other utilities continue to shift the components of the grid away from classic fossil fuel generators to intermittent renewable energy sources, there will be less inertia on the grid, making the inertia provided by the Project more important. And, running battery storage in place of the RICE units in the way

Sierra Club proposes would result in the RICE units providing less inertia to the grid.

¶54     Another witness for Applicants, Scott Johnson, the asset manager for RICE at Wisconsin Public Service Company, testified to the following. Adding battery storage to the RICE units would prevent the RICE units from providing flexibility, inertia, frequency control, and voltage control. The RICE units cannot provide the same level of inertia when they are starting up, and inertia is needed in a shorter amount of time than it would take for the RICE units to start up and achieve full load, which time would pass if the RICE units were required to start up from having been turned off because battery storage was running instead. Therefore, adding battery storage to the RICE units would disrupt system reliability.

¶55     Binzley, the Department's witness, testified that, when reviewing Applicants' permit application, he understood inertia to be part of the purpose and need for the Project.

¶56     Following the hearing, the ALJ issued findings of fact, conclusions of law, and an order affirming the permit. Pertinent here, the ALJ concluded that Sierra Club "failed to establish by a preponderance of the evidence that the Department erroneously excluded the addition o[f] battery storage to the RICE units in the BACT analysis" because the addition of battery storage would redefine the source. The ALJ reached this conclusion for three overarching reasons: the addition of battery storage would interfere with the Project's fundamental purpose of inertia; the space required by the addition of battery storage would require a fundamental redesign of the Project; and the addition of battery storage would change the Project's purpose into "one of both energy production and energy

storage instead of solely … energy generation."  The ALJ also found that Sierra Club failed to show "how the physical space required by 26 MW of battery storage would not require a fundamental redesign."

*Analysis*

¶57     We conclude that the Department's exclusion of battery storage in step one of the BACT analysis is supported by substantial evidence and consistent with applicable law.

¶58     *Interference with fundamental purpose of inertia.*  A proposed mitigation measure that interferes with a project's fundamental purpose may be excluded in step one of the BACT analysis as redefining the source.  *See In re Arizona Pub. Serv. Co.*, 17 E.A.D. at 336 (explaining that mitigation measures that disrupt a project's purpose and design may be excluded because they redefine the source).  The ALJ found that inertia was a fundamental purpose of the Project, and that "not only would the batteries not provide inertia, … they would interfere with the RICE units … providing [inertia] … because the reason to include [the batteries] would be to reduce the RICE units' use," and "the RICE units would only provide inertia if they were up and running at full speed."  Inertia was clearly listed in the application's section on project "purpose and need," and several witnesses testified that inertia was a fundamental purpose of the Project. Witnesses also explained how the battery storage would interfere with that purpose.  The ALJ further found that fast frequency response is not a substitute for inertia.

¶59     Sierra Club argues that the ALJ's "factual premise," that the addition of batteries would reduce the amount of time the RICE units are up and running at full speed, "is wrong and not supported by the evidence."  While Sierra Club's

witness testified that Applicants do not need inertia and that batteries could provide the frequency stabilization Applicants actually need, witnesses for the Applicants testified to the contrary. In addition, two of Applicants' witnesses testified that adding batteries would interfere with the RICE units providing inertia. It was within the ALJ's province to find more credible the testimony of those witnesses over the testimony of Sierra Club's witness. *See WMC*, 94 Wis. 2d at 322 ("[W]hen the issues basically involve a dispute over conflicting testimony and a reasonable [person] could be convinced by either side, it is within the administrative agency's province to weigh it and accept that which it finds more credible." (quoted source omitted)).

¶60 In sum on this issue, there was substantial evidence in the record to support the ALJ's finding that adding batteries to the RICE units would reduce the RICE units' use, thereby reducing the amount of inertia on the grid, which would interfere with a stated fundamental purpose of the Project. Sierra Club fails to show that the Department's exclusion of battery storage in step one of the BACT analysis on this basis was unsupported by substantial evidence or contrary to applicable law.

¶61 *Space constraints.* As stated, space constraints may be considered as a basis for excluding a mitigation measure in step one of the BACT analysis. *In re La Paloma Energy Ctr.*, 16 E.A.D. at 288. There was substantial evidence in the form of testimony by both Applicants' witnesses and Sierra Club's witness to support the ALJ's finding that adding batteries would require a redesign of the Project due to the considerable amount of space required to house 26 MW of battery storage. Sierra Club asserts that the Department's reliance on spatial constraints "refers to technical infeasibility in [s]tep [two] of the BACT process, not 'redefining the source' in [s]tep [one]." However, Sierra Club does not

support this assertion with relevant legal authority, or explain why the case law to the contrary cited above does not apply. Sierra Club fails to show that the Department's exclusion of battery storage in step one of the BACT analysis on this basis was unsupported by substantial evidence or contrary to applicable law.

¶62 *Change of purpose.* The ALJ's third reason for its conclusion that adding battery storage would redefine the source is that the addition of battery storage would change the Project's purpose into "one of both energy production and energy storage instead of solely" energy production. The parties dispute whether this reason creates the "automatic off-ramp [from BACT analysis] for energy storage" that was rejected in *In re Arizona Public Service Co.*, 17 E.A.D. at 347. We need not reach this issue because our conclusion that the two reasons noted above—interference with inertia and space constraints—are supported by substantial evidence and legally sound suffices to affirm the Department's exclusion of battery storage in step one of the BACT analysis as redefining the source. *Cf. In re La Paloma Energy Ctr.*, 16 E.A.D. at 288-90 (concluding that permitting authority's rationale that it could exclude solar energy as redefining the source because the applicant did not propose it in its application "comes very close to suggesting that adding supplemental … generation is always redesign," which would constitute an "automatic BACT off-ramp," but affirming the decision to exclude solar energy on other grounds).

¶63 *Exceeding authority.* As to the two reasons that we uphold for the Department's exclusion of battery storage in step one of the BACT analysis as redefining the source—interference with inertia and space constraints—Sierra Club argues that the ALJ exceeded its authority by relying on post hoc rationales. Specifically, Sierra Club argues that the Department, in its original permitting decision, did not base its conclusion that adding battery storage would redefine the

source on interference with inertia or space constraints. Therefore, Sierra Club's argument continues, the ALJ exceeded its authority when it considered and relied on those rationales, rather than reviewing only the rationales stated by the Department in its original decision. The question of whether the Department exceeded its authority is a question of law, "and we owe no deference to an agency's determination of the scope of its powers." *Xcel Energy Servs., Inc. v. LIRC*, 2013 WI 64, ¶25, 349 Wis. 2d 234, 833 N.W.2d 665.

¶64 Under WIS. STAT. § 285.81(1)(a) and (2), a party that seeks a hearing challenging a permit shall submit a petition in which it identifies the issues to be reviewed, the reasons for the hearing, and the relief requested. Under § 285.81(1)(b), "[t]he hearing shall be a contested case under [WIS. STAT.] ch. 227," and "the petitioner shall present evidence in support of the allegations made in the petition." Under WIS. STAT. § 227.44(4)(b), the Administrative Law Judge shall issue a pre-hearing memorandum that limits the issues that may be addressed at the hearing to those set forth in the memorandum. Also under § 285.81(1)(b), the ALJ may only affirm, modify, or withdraw the Department's decision. Sierra Club points to no language in these statutes that cabins the ALJ to the evidence, arguments, and rationales proffered by the parties and Department at the time of the original permitting decision.

¶65 The regulations confirm that the parties and ALJ are not so cabined. WISCONSIN ADMIN. CODE § NR 2.11(2) provides that, in contested case hearings, the ALJ "may allow prehearing discovery and the preservation of evidence." WISCONSIN ADMIN. CODE § NR 2.14 allows for the admission of evidence, including documentary exhibits and prepared testimony, and clarifies that "[e]vidence submitted at the time of hearing need not be limited to matters set forth in pleadings, petitions or applications." § NR 2.14(2).

¶66 Here, in its original permitting decision, the Department stated that battery storage "constitutes a redefinition of the source because it alters the facility's basic design" and represents a "substantial change" to the Project. The Department granted Sierra Club's petition for a hearing and identified as one of the issues to be heard, "[w]hether the Department erroneously excluded the addition of battery storage to the [RICE] units in the [BACT] analysis as 'redefining the source.'" Consistent with the regulations cited above, the parties presented evidence and made arguments pertinent to the issue to be heard, and the ALJ affirmed the Department's decision based on rationales arising from the evidence and arguments presented.

¶67 Sierra Club does not cite any legal authority that precludes the parties to the hearing from expanding on the evidence and arguments considered by the Department in its original decision, and presenting additional evidence and arguments for and against that decision, or that precludes the ALJ from relying on rationales arising from the additional evidence and arguments presented. Indeed, it would defeat the purpose of holding a contested case hearing on a permitting decision if all the ALJ could do is review only the evidence and arguments before the Department when it made the original decision and limit the ALJ's decision to the Department's originally stated rationales; there would be nothing to "hear."

¶68 The cases that Sierra Club cites in support of the proposition that the ALJ "may only review the decision the [Department] actually made" based on the evidence, arguments, and rationales presented at the time of the Department's original decision, are inapposite. Sierra Club cites *Village of Thiensville v. DNR*, 130 Wis. 2d 276, 283, 386 N.W.2d 519 (Ct. App. 1986), for the proposition that "the scope of the ALJ's authority under WIS. STAT. § 285.81 is to *review* the decision [the Department] made; it is not to substitute a new decision on

alternative rationales." But *Village of Thiensville* merely states that WIS. STAT. § 147.20 (1983-84), now WIS. STAT. § 283.63, requires the ALJ, on review of a permit, "to limit [the ALJ's] review … to events which had been considered by the agency. Those [the ALJ] may 'consider anew,' but [the ALJ] may not examine what the agency had no opportunity to examine." *Village of Thiensville*, 130 Wis. 2d at 283. This case is distinguishable because, first, the applicable statute is not the same, and, second, as explained above, WIS. ADMIN. CODE § NR 2.14 explicitly allows for the introduction and consideration of evidence not presented in the permit or application. In addition, Sierra Club does not identify any "events" considered by the ALJ that the Department did not consider, or explain why the ALJ did something other than "'consider anew'" the redefining-the-source issue, consistent with the language in *Village of Thiensville* that it cites. *See id.* Accordingly, *Village of Thiensville* does not bolster Sierra Club's argument.

¶69 Sierra Club cites *Stas v. Milwaukee County Civil Service Commission*, 75 Wis. 2d 465, 474, 249 N.W.2d 764 (1977), for the proposition that the scope of an ALJ's review is analogous to the scope of judicial review, which is limited to the grounds invoked by the agency. While *Stas* does limit a reviewing court to the grounds invoked by the agency, it does not support Sierra Club's assertion that an ALJ presiding over a contested case hearing is confined in the same way. *Id.*

¶70 Sierra Club cites *Meteor Timber, LLC v. DHA*, 2022 WI App 5, 400 Wis. 2d 451, 969 N.W.2d 746 (2021), and *Kohler Co.*, 410 Wis. 2d 433, for the proposition that it would "eviscerate the statutory process" to allow the Department to introduce post-permit information during the review process. But both of those cases involved attempts by permit applicants and the Department to

correct an omission in the administrative record by introducing new information at the contested case hearing that was necessary to the decision on the permit *before* the permit was granted. *See Meteor Timber*, 400 Wis. 2d 451, ¶64 ("It would eviscerate the statutory process to allow conditions that … 'address information not otherwise available at the point of permit application,' when that information is necessary for the Department to assess whether it may issue the permit for the proposed project under statutory standards."); *Kohler Co.*, 410 Wis. 2d 433, ¶¶75-78 (explaining that additional evidence may be presented on an issue at a contested case hearing unless the issue is whether the Department "had sufficient information to issue a permit *at the time the decision was made*"). These cases do not support Sierra Club's argument that new evidence may never be considered at a contested case hearing. To the extent that the Department's "redefining the source" rationale may have been vague or incompletely explained in its original permitting decision, this differs significantly from *Meteor Timber* and *Kohler Co.*, in which the Department explicitly stated that required information was missing at the time the Department conducted its review of the permit.

¶71 In addition, as part of its exceeding authority argument, Sierra Club contends that the ALJ exceeded the grant of the hearing and the issues identified in the pre-hearing memorandum. By its terms, the ALJ granted a hearing on whether battery storage redefines the source, and, accordingly, it was permitted to consider evidence and arguments on that issue. As we have explained above, both interference with inertia as a project purpose and space constraints were proper considerations in the redefining-the-source analysis. Accordingly, the ALJ did not exceed the grant of the hearing.

¶72 Also as part of its exceeding authority argument, Sierra Club contends that the procedure here "undermines the statutory permitting procedures"

and is "fundamentally unfair" to Sierra Club. However, as we have explained above, the Department and ALJ complied with the permitting and hearing procedures, and Sierra Club had an opportunity to, and did, participate and present evidence and make arguments throughout those proceedings.

### III. Whether the Background Concentration Protocol Is a Rule

¶73     The Background Concentration Protocol is a document that sets forth the procedure the Department employs for setting background pollutant concentrations for air permit modeling. Sierra Club argues that the Protocol is a rule. The parties agree that the Protocol was not promulgated following statutory rulemaking procedures, and, accordingly, if it is a rule, it must be declared invalid. *See Cholvin*, 313 Wis. 2d 749, ¶21 ("[A] court shall declare a rule invalid if it finds that it was promulgated without complying with statutory rule-making procedures."). "'Whether an agency's action constitutes a rule under WIS. STAT. § 227.01(13) presents a question of law, which we review de novo.'" *Lamar Cent. Outdoor, LLC v. DHA*, 2019 WI 109, ¶10, 389 Wis. 2d 486, 936 N.W.2d 573 (quoted source omitted).

¶74     Resolving this issue also requires that we interpret and apply statutes, which are questions of law that we review de novo. *Meyers v. Bayer AG*, 2007 WI 99, ¶22, 303 Wis. 2d 295, 735 N.W.2d 448. When interpreting a statute, we begin with its language, giving the statutory language "its common, ordinary, and accepted meaning." *State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110. "'If the meaning of the statute is plain, we ordinarily stop the inquiry.'" *Id.* (quoted source omitted). Additionally, "[p]revious cases construing a statute … become a part of our understanding of a statute's plain meaning." *Meyers*, 303 Wis. 2d 295, ¶23.

¶75  "Rule" is defined in WIS. STAT. § 227.01(13) as follows:

> "Rule" means a regulation, standard, statement of policy, or general order of general application that has the force of law and that is issued by an agency to implement, interpret, or make specific legislation enforced or administered by the agency or to govern the organization or procedure of the agency.

"Wisconsin courts have distilled this statutory definition of a 'rule' under WIS. STAT. ch. 227 into a five-element test: '(1) a regulation, standard, statement of policy or general order; (2) of general application; (3) having the effect of law; (4) issued by an agency; (5) to implement, interpret or make specific legislation enforced or administered by such agency.'"[10]  *Midwest Renewable Energy Ass'n v. PSC (MREA)*, 2024 WI App 34, ¶44, 412 Wis. 2d 698, 8 N.W.3d 848 (quoting *Citizens for Sensible Zoning, Inc. v. DNR (CSZ)*, 90 Wis. 2d 804, 814, 280 N.W.2d 702 (1979)).  The label the agency gives to the action is immaterial; whether the action is a rule depends on its substance—specifically, whether it meets all five elements of a rule.  *See, e.g.*, *MREA*, 412 Wis. 2d 698, ¶44; *Milwaukee Area Joint Plumbing Apprenticeship Comm. v. DILHR*, 172 Wis. 2d 299, 320, 493 N.W.2d 744 (Ct. App. 1992).

---

[10]  As explained below, the Background Concentration Protocol was first issued in 2008, and was updated in 2017 and 2021.  The statute defining a rule has remained the same since 2008, except that, in 2017, the legislature modified the definition of "rule" to require that an agency action have the "force of law" rather than the "effect of law."  *Midwest Renewable Energy Ass'n v. PSC*, 2024 WI App 34, ¶44 n.21, 412 Wis. 2d 698, 8 N.W.3d 848.  Our supreme court has interpreted these phrases synonymously, *see id.*, and, accordingly, the distinction does not affect our analysis.

The statutes in WIS. STAT. ch. 285 enforced and administered by the Department regarding the permitting of sources of air pollution have also not changed since 2008 in any respect pertinent to our analysis.

¶76    The parties here agree that the Background Concentration Protocol satisfies the second and fourth elements of the test—that the Protocol is of general application and that it was issued by an agency—but they dispute whether the Protocol satisfies the first, third, and fifth elements. We next present additional background regarding the Background Concentration Protocol and then address the first, third, and fifth elements in turn.

*Additional Background*

¶77    Pursuant to WIS. STAT. § 285.63(1)(b), before issuing an air permit, the Department must first find that the proposed source "will not cause or exacerbate a violation of any ambient air quality standard or ambient air increment," such as the National Ambient Air Quality Standards (NAAQS). Sec. 285.63(1)(b); *see also* WIS. ADMIN. CODE § NR 405.09. In order to make this determination, the Department must add the anticipated pollution from the proposed source to the existing, or background, concentrations of pollutants in the area. At issue in this case is the Department's procedure for determining the background concentrations that will be used in this equation.[11]

¶78    The Department is guided in this effort to determine background concentrations by federal regulations which implement the Clean Air Act, specifically 40 C.F.R. part 51, which details what states must do to comply with

---

[11] We clarify the key terms "ambient" and "background concentrations" as follows. "'Ambient air' means the portion of the atmosphere external to buildings and to which the general public has access." WIS. ADMIN. CODE § NR 400.02(24). "Background concentrations," which are required to be calculated in a specific manner as explained in the text, are derived from ambient monitoring data. *See, e.g.*, 40 C.F.R. part 51, Appendix W, § 8.3.2(c)(i) (explaining that when an "existing facility is determined to impact the ambient monitor, the background concentration at each monitor can be determined by excluding" certain values).

the Act. Appendix W, titled "Guideline on Air Quality Models," "provides air quality modeling techniques that should be applied to … air quality assessments" and "should serve as a common measure of acceptable technical analysis when supported by sound scientific judgment." 40 C.F.R. part 51, Appendix W, § 1.0(a); *see also* WIS. ADMIN. CODE § NR 484.04 (incorporating Appendix W by reference). "Section 8 [of Appendix W] makes recommendations for data inputs to models including … background air quality…." 40 C.F.R. part 51, Appendix W, § 1.0(h).

¶79 Subsection 8.3 of Appendix W specifically focuses on background concentrations. In part, that subsection provides that "the air quality monitoring data should be of sufficient completeness and follow appropriate data validation procedures. These data should be adequately representative of the area to inform calculation of the design concentration for comparison to the applicable NAAQS." 40 C.F.R. part 51, Appendix W, § 8.3.1(b). The subsection provides additional guidelines for air quality monitoring data but does not dictate a specific procedure for setting background concentrations.[12]

---

[12] *See, e.g.*, 40 C.F.R. part 51, Appendix W, § 8.3.2(b) (For isolated sources, "the EPA recommends using data from the monitor closest to and upwind of the project area…. If there are no monitors located in the vicinity of the new or modifying source, a 'regional site' may be used to determine background concentrations. A regional site is one that is located away from the area of interest but is impacted by similar or adequately representative sources."); § 8.3.2(c)(ii) ("There may be … circumstances which would necessitate modifications to the ambient data record. Such cases could include removal of data from specific days or hours when a monitor is being impacted by activities that are not typical or not expected to occur again in the future…."); § 8.3.2(a) ("The application of the EPA's recommended framework for determining an appropriate background concentration should be consistent with appropriate EPA modeling guidance and justified in the modeling protocol that is vetted with the appropriate reviewing authority (paragraph 3.0(b)).").

¶80    Before 2008, the Department set background concentrations on a county-by-county basis in Wisconsin.  Because ambient air quality monitors were not located in every county, the Department assigned representative values from neighboring counties to counties without monitors.  In 2007 and 2008, the Department convened a group of stakeholders to develop a new procedure for setting background concentrations in Wisconsin.

¶81    Pursuant to the Background Concentration Protocol, first introduced in 2008 and still in effect today, the Department divides the state into "higher" and "lower" background concentration areas based on municipal boundaries and population.  Cities and villages with a population of 25,000 or more, as well as neighboring cities and villages with a population density of more than half of the main city or village, are labeled "higher" background concentration areas.  Everywhere else is a "lower" background concentration area.  If a proposed permit source lies both inside and outside of a "higher" background concentration area, the higher background concentration should be used.  Thus, under the Protocol, a proposed source may be allowed to emit a higher level of a pollutant if the source is located in a lower background concentration area than if it is located in a higher background concentration area, without violating the limit for the pollutant at issue.

¶82    The Background Concentration Protocol states that the background concentrations listed in the table in the Protocol "are the values to be used for air dispersion modeling."  The table lists six pollutants, and higher and lower concentrations for each of the pollutants.  The Protocol contains a map that shows "in what areas the higher background concentration[s] are to be used and in what areas the lower concentration[s] are to be used."  The Protocol requires that "the higher background concentrations must be used" for sources located in the

identified higher background concentration areas, and that sources located in the remainder of the state "should use the low background [concentrations]." The Protocol contains formulas for background concentration values for both the higher and lower background concentration areas.

¶83    We clarify that the Background Concentration Protocol that applied to the permit at issue here differs from the 2008 and 2017 versions of the Protocol in one respect. The prior two versions of the Protocol required that one of two options be used for determining background concentrations: the option described in the text (the concentrations identified by the Department for higher and lower background concentration areas and listed in a table in the Protocol), or the concentrations derived from monitors that the source installed "in an appropriate location" and that provided "a minimum of two (2) full years of data." As stated, the current, applicable Protocol mandates only the first of these options.

*Analysis*

*1. Regulation, standard, statement of policy, or general order*

¶84    As stated, the first element that must be satisfied in order for an agency action to constitute a rule is that the action is "a regulation, standard, statement of policy, or general order." WIS. STAT. § 227.01(13); ***MREA***, 412 Wis. 2d 698, ¶46. We conclude that the Background Concentration Protocol is a statement of policy.

¶85    The term "statement of policy" is not defined in WIS. STAT. ch. 227 or in the administrative statutes pertaining to agencies. Neither has case law illuminated its meaning. Therefore, we turn to dictionary definitions to assist in our determination of the meaning of this term. *See **MREA***, 412 Wis. 2d 698, ¶47

(relying on dictionary definition when term not defined in statutes). A representative definition of "statement" is "[s]omething stated; a declaration." *Statement*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, https://ahdictionary.com/word/search.html?q=statement (last visited May 12, 2025). One definition of "policy" is "a definite course or method of action selected from among alternatives and in light of given conditions to guide and determine present and future decisions." *Policy*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/policy (last visited May 12, 2025). Another definition of "policy" is "[a] standard course of action that has been officially established by an organization, business, political party, etc." *Policy*, BLACK'S LAW DICTIONARY (10th ed. 2014).

¶86 Putting these together, a "statement of policy" is a declaration of a standard course of action established by an entity, selected from among alternatives, to guide present and future decisions. As described, the Background Concentration Protocol declares the course of action established by the Department for setting background concentration values across the state by dividing the state into "higher" and "lower" background concentration areas based on population and population density, and identifying "higher" and "lower" background concentration values for the two different areas based on a formula described in the Protocol. This course of action was selected from among alternatives, including the previous county-by-county determination of background concentration values, and sets the procedure by which the Department shall determine what background concentration values to use in permits and permit applications for proposed source locations and, accordingly, the levels of additional pollution allowed in the issued air permits before such pollution would

39

violate ambient air quality standards. Thus, the Protocol sets forth a course of action that determines the Department's air pollution permitting decisions.

¶87 The Department makes related arguments about this element, but none are persuasive.[13] It argues that the Background Concentration Protocol is not a "regulation, standard, statement of policy, or general order" because the attributes of the Protocol that Sierra Club cites in support of this proposition are also "attributes of guidance documents." The Department does not cite any law in support of its implicit assertion that guidance documents and rules cannot share any attributes. The Department does quote *SEIU, Local 1 v. Vos*, 2020 WI 67, 393 Wis. 2d 38, 946 N.W.2d 35, for its holding that guidance documents "contain the executive's interpretation of the laws, his judgment about what the laws require him to do." *Id.*, ¶106. While this proposition is undoubtedly sound, the Department fails to explain how it supports the Department's assertion that the Protocol is not a statement of policy, and we reject this argument on that basis. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) ("Arguments unsupported by references to legal authority will not be considered[,]" and "[w]e may decline to review issues inadequately briefed.").

¶88 For these reasons, the Background Concentration Protocol is a statement of policy and satisfies the first element of a rule in WIS. STAT. § 227.01(13).

---

[13] Applicants do not address this element on appeal.

## 2. *Effect of law*

¶89    The third element that must be satisfied in order for an agency action to constitute a rule is that the action has the "effect of law." *MREA*, 412 Wis. 2d 698, ¶71.  We conclude that the Background Concentration Protocol has the effect of law.

¶90    "An agency regulation, standard, statement of policy or general order has been held to have the 'effect of law' where criminal or civil sanctions can result as a violation; where licensure can be denied; and where the interest of individuals in a class can be legally affected through enforcement of the agency action."  *Cholvin*, 313 Wis. 2d 749, ¶26.  Mandatory language "in which the agency 'speaks with an official voice intended to have the effect of law'" will satisfy this element, while materials "developed by an agency as a reference aid for its staff" are not likely to have the effect of law.  *County of Dane v. Winsand*, 2004 WI App 86, ¶11, 271 Wis. 2d 786, 679 N.W.2d 885.

¶91    However, the fact that an agency issues a document for the use of its staff does not necessarily mean that the document does not have the effect of law. *See Cholvin*, 313 Wis. 2d 749, ¶¶27-29 (concluding that instruction to Department of Health and Family Services' staff regarding screening of Medicaid applicants had the effect of law).  Instead, courts must look to whether the agency action "uses 'express mandatory language' that is 'more than informational,'" and whether enforcement of the action can affect a class of persons' legal rights. *MREA*, 412 Wis. 2d 698, ¶71 (quoted source omitted).

¶92    In *State ex rel. Clifton v. Young*, 133 Wis. 2d 193, 200, 394 N.W.2d 769 (Ct. App. 1986), the Department of Health and Social Services "prepared and disseminated a memorandum stating that it was 'adopting procedures' for

determining good time forfeitures and directing the examiners to consider specific criteria in making those determinations." The memorandum "announce[d] the general policies and the specific criteria under which all decisions on good time for mandatory release parole violations are to be made, now and in the future," referring to promulgated rules and regulations containing those standards. *Id.* This court concluded that the memorandum had the effect of law. *Id.*

¶93   Similarly, in *Cholvin v. DHFS*, 313 Wis. 2d 749, the Department of Health and Family Services updated its internal instructions for employees screening individuals for Medicaid waiver eligibility. *Id.*, ¶13. The new instructions stated that a certain box, which determined an individual's eligibility for a Medicaid waiver, was "to be checked if the person needs help at least one third of the time." *Id.*, ¶18. In other words, the instruction provided, "[w]hen frequency is at question, screeners should use a simple one-third rule." *Id.* The prior instructions had stated that the box was to be checked if the person needed help "on a 'bad' day." *Id.*, ¶17. This court concluded that the instructions had the effect of law because they removed the screening employees' discretion and used mandatory terms that were "not simply advisory." *Id.*, ¶29.

¶94   In contrast, in *County of Dane v. Winsand*, 271 Wis. 2d 786, Winsand challenged the standards used to approve the use of a breath testing instrument by a section chief at the Department of Transportation. *Id.*, ¶5. A rule whose validity was not at issue provided that the section chief "shall … evaluate[]" all breath testing instruments, and that "[t]he procedure for evaluation shall be determined by the" section chief. *Id.*, ¶8. Winsand challenged a document labeled as an "Evaluation Protocol," which contained "procedures for testing the instruments and consist[ed] largely of questions to be asked in evaluating the instruments." *Id.*, ¶11. This court concluded as follows: "Materials

developed by an agency as a reference aid for its staff that are 'couched … in terms of advice and guidelines rather than setting forth law-like pronouncements' are not a 'rule' within the meaning of WIS. STAT. § 227.01(13) because they are not intended to have the effect of law." *Id.* (quoted source omitted).

¶95 The Background Concentration Protocol states that the document "does not contain any mandatory requirements except where requirements found in statute or administrative rule are referenced," and that "[t]his guidance does not establish or affect legal rights or obligations and is not finally determinative of any of the issues addressed." The Department's expressed intent notwithstanding, the Protocol uses express mandatory language: "[t]he background concentrations listed in [the table in the memo] *are the values to be used* for air dispersion modeling"; permits "*will be evaluated* with the background concentrations noted in this memo"; "the higher background concentrations *must be used*" in the identified areas. (Emphasis added.)

¶96 Like the documents found to have the effect of law in *Clifton* and *Cholvin*, the Background Concentration Protocol expressly tells the Department's staff how to determine a critical input to an ultimate determination—how much pollutant a proposed source may be permitted to emit—that affects a class of persons' legal rights. In *Cholvin*, the challenged procedure expressly directed the agency's staff to enter a certain input on a form if a person needed assistance with a certain activity of daily living less than one-third of the time. *Cholvin*, 313 Wis. 2d 749, ¶18. This entry could result in ineligibility for a Medicaid waiver. *Id.*, ¶14. Likewise, the challenged Protocol here expressly directs Department staff to enter a certain input into their calculations to determine whether a proposed source would violate ambient air quality standards. This input, when combined with the modeled anticipated pollution from the proposed source, could

result in the denial of a permit. *See* WIS. STAT. § 285.63(1)(b) (explaining that, in order for the Department to approve a permit application, it must find, among other things, that "[t]he source will not cause or exacerbate a violation of any ambient air quality standard").

¶97 Applicants and the Department argue that the Background Concentration Protocol does not have the effect of law because it does not on its own determine whether a permit will be approved or denied. However, as explained above, the background concentration *could* result in the denial of a permit for a proposed source whose modeled emissions, in combination with the background concentration, violate ambient air quality standards. Moreover, if background concentrations were calculated in a different manner, that might lead to a different result. And, as Applicants themselves acknowledge, an agency action has the force of law when it "*could* affect one's legal interests." ***Tavern League of Wis., Inc. v. Palm***, 2021 WI 33, ¶22, 396 Wis. 2d 434, 957 N.W.2d 261 (emphasis added).

¶98 Applicants also argue that the Background Concentration Protocol does not have the effect of law because permit applicants may request to use different background concentration data from monitors located in the vicinity of the project. This argument does not accurately represent the requirement in the Protocol applicable to the permit.[14] The Protocol states that it "lists all the areas

---

[14] As described above, the 2008 and 2017 Protocols limit the Department to determining background concentration values based on data from either: (1) monitors across the state and region and depending on whether a source is in a "higher" or "lower" background concentration area based on population and population density; or (2) a monitor installed by the source "in an appropriate area" and providing two years of data. The current, applicable Background Concentration Protocol includes only the first option.

(continued)

where the higher background concentrations must be used." Thus, the Protocol contains mandatory language directing how Department staff are to select the background concentration values for purposes of air permit modeling.

¶99 The Department also argues that "[w]ithout any showing that th[e] [Background Concentration Protocol] would ever be enforced against someone or how that enforcement would come about," Sierra Club cannot satisfy this element. However, we have explained above how the Protocol could be enforced to result in denial of a permit.

¶100 Finally, both the Department and Applicants argue that "[t]he touchstone of the requirement is agency intent, specifically whether the agency has spoken with an 'official voice intended to have the effect of law.'" *Cf. MREA*, 412 Wis. 2d 698, ¶71. However, as we explained above, agency intent is not determinative of this element. *See id.* (touchstone is whether agency uses mandatory language that is more than informational). Here, as noted, the Protocol uses mandatory language to create a process that can affect legal rights.

### 3. Implement, interpret or make specific legislation

¶101 The fifth element of a rule is that the action is issued "to implement, interpret, or make specific legislation enforced or administered by the agency." WIS. STAT. § 227.01(13). Sierra Club argues that the Department adopted the

---

Applicants argue that the second option still exists, relying on a statement in an affidavit from the Department's Coordinator of the Stationary Source Modeling Team in the Bureau of Air Management. In that affidavit, the Coordinator avers that "[p]ermit applicants always have the option of using air quality monitoring data they collect from monitors located in the vicinity of the proposed project to determine the background concentrations." However, he makes this averment regarding the 2008 version of the Protocol. As explained in the text, that option is part of the 2008 and 2017 versions, but not the Protocol applicable here.

Background Concentration Protocol "to implement, interpret or make specific the requirements in WIS. STAT. § 285.63(1)(b), WIS. ADMIN. CODE § NR 405.10, and 40 C.F.R. Pt. 51, App[endix] W." Specifically, Sierra Club argues that the Protocol both "implements" and "interprets" § 285.63(1)(b). We conclude that the Background Concentration Protocol implements legislation.

¶102 "An agency action implements a statute when it carries out or gives practical effect to the statute." *MREA*, 412 Wis. 2d 698, ¶74. An agency action interprets a statute when it selects and puts into practice one meaning of an ambiguous statute. *See Schoolway Transp. Co. v. DMV*, 72 Wis. 2d 223, 235-36, 240 N.W.2d 403 (1976) (no interpretation when statute unambiguous); *Tavern League*, 396 Wis. 2d 434, ¶¶25, 33 (interpretation occurs when agency has to adopt its own understanding of an undefined term in a statute). A single agency action may both interpret and implement a statute. *See Tavern League*, 396 Wis. 2d 434, ¶33 (explaining that "by way of its implementation, DHS interpreted the statute").

¶103 WISCONSIN STAT. § 285.63(1)(b), the statute Sierra Club argues the Background Concentration Protocol implements, provides: "The [D]epartment may approve the application for a permit required or allowed under [WIS. STAT. §] 285.60 if it finds: … The source will not cause or exacerbate a violation of any ambient air quality standard or ambient air increment under [WIS. STAT. §] 285.21(1) or (2)[.]" Section 285.21(1) and (2) provide that the Department "shall promulgate by rule" ambient air quality standards that are not more restrictive than the federal standards, "may promulgate" ambient air quality standards for contaminants not regulated by federal standards if certain findings are made, and "shall promulgate by rule ambient air increments for various air contaminants in attainment areas." Sec. 285.21(1), (2). The Department

promulgated by rule ambient air quality standards and ambient air increments in WIS. ADMIN. CODE § NR 404.04 and 404.05.

¶104 Accordingly, under WIS. STAT. § 285.63(1)(b), to issue a permit the Department must find that the proposed source will not violate the ambient air quality standards promulgated in WIS. ADMIN. CODE § NR 404.04 and 404.05. To do so, as explained above, the Department must necessarily determine or set the background concentrations for the proposed permit location and add the anticipated pollution from the proposed source.

¶105 The Department also promulgated by rule WIS. ADMIN. CODE § NR 405.10, which provides: "All estimates of ambient concentrations required under this chapter shall be based on the applicable air quality models, data bases, and other requirements specified in the Guideline on Air Quality Models (Revised) in Appendix W of 40 CFR part 51, incorporated by reference in [WIS. ADMIN. CODE §] NR 484.04." All parties agree that the Background Concentration Protocol, at minimum, "explains" or "communicates guidance about the application of" Appendix W.

¶106 The Applicants and the Department seem to be arguing that the fifth element is not satisfied because the Protocol does not implement any statute, and only implements regulations (that is, Appendix W). Neither cite any authority to support the proposition, and the authority we found is to the contrary. *See Wisconsin Electric Power Co. v. DNR*, 93 Wis. 2d 222, 287 N.W.2d 113 (1980). Here, WIS. STAT. § 285.63(1)(b) requires the Department to find that permitting the proposed source does not violate ambient air quality standards, and the Department's implementation of Appendix W also implements this statutory requirement. In other words, the Protocol "carries out and gives practical effect

to" the Department's authority, delegated by the statute, to determine whether a proposed source will cause a violation of an ambient air quality standard. *See MREA*, 412 Wis. 2d 698, ¶76.

¶107 The Department also argues that Sierra Club's challenge "is forfeited, moot, and can have no effect on the permit." Specifically, the Department argues that, because Sierra Club focused its challenge on the current, applicable Background Concentration Protocol in the circuit court, it forfeited any argument based on the 2008 Protocol. The Department also argues that, to the extent that Sierra Club challenges only the 2008 Protocol on appeal, that challenge is moot because it has been "superseded" by the current Protocol. These arguments mischaracterize Sierra Club's challenge. It is clear from Sierra Club's briefing, both here and in the circuit court, that its challenge is to the language in the current, applicable Protocol directing the Department how to select the background concentration values to be used in air permit modeling. That language directs the Department to select background concentration values based on creating "higher" and "lower" background concentration areas, assigning cities and villages to these areas based on population and population density, and calculating a certain average of data from monitors across the state and region. It is this procedure employed by the Department to select background concentrations for air permit modeling that Sierra Club has challenged as an invalid rule, in both the circuit court and this court. Accordingly, this challenge was not forfeited, and it is not moot.

¶108 In sum, the Background Concentration Protocol meets all five elements of the statutory definition of a rule in WIS. STAT. § 227.01(13).[15] Because Applicants and the Department concede that the Protocol was not promulgated in accordance with statutory rulemaking procedures, "it is invalid and unenforceable." *See MREA*, 412 Wis. 2d 698, ¶78.

*Remedy*

¶109 Sierra Club asks us to "reverse the [Department's] decision and remand for a new determination of the plant's impacts on air quality pursuant to WIS. STAT. § 28[5].63(1)(b) and WIS. ADMIN. CODE § NR 405.09 based on source specific background pollution rather than relying on the unpromulgated Background [Concentration Protocol]." Applicants respond that Sierra Club "never requested this remedy from either the ALJ or the circuit court and cannot do so for the first time on appeal," and that vacating the permit would prevent the plant from operating and "leave a 128 MW hole in the grid." Applicants ask that we remand to the Department "to conduct air modeling in any manner permitted by Appendix W, in [the Department's] discretion." The Department does not address remedy.

¶110 We agree that the Department's reliance on an invalid rule to set air pollution limits in the permit at issue requires that we remand to the Department to

---

[15] Sierra Club argues that, if the Background Concentration Protocol does not satisfy the definition of a rule under WIS. STAT. § 227.01(13), it had to be promulgated as a rule pursuant to WIS. STAT. § 227.10(1) because it is a "statement of general policy." Because our conclusion that the Protocol is a rule under § 227.01(13) is dispositive, we do not address this alternative argument. *See Barrows v. American Fam. Ins. Co.*, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

reopen the permit. However, we decline to vacate the permit or to dictate to the Department how to set the air pollution limits on remand. Instead, we believe that the relief that is "appropriate" and "preserve[s] the interests of … the public pending further proceedings or agency action," WIS. STAT. § 227.57(9), is to remand to the circuit court to remand to the Department to reopen the permit and proceed consistent with this opinion, and to keep the permit in place during remand proceedings.

## CONCLUSION

¶111  For the foregoing reasons, we affirm the part of the circuit court's order concluding that the Department appropriately excluded battery storage in step one of the BACT analysis as redefining the source and reverse that part of the order concluding that the Background Concentration Protocol is not a rule. Accordingly, we remand to the circuit court to remand to the Department to reopen the permit and proceed consistent with this opinion.

*By the Court.*—Order affirmed in part, reversed in part and cause remanded with directions.

Recommended for publication in the official reports.